In the

# United States Court of Appeals
## For the Seventh Circuit

No. 10-3392

TORRANCE JONES,

*Petitioner-Appellant,*

*v.*

JAMES CROSS, JR., WARDEN,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 07-cv-00673—**David R. Herndon**, *Chief Judge.*

ARGUED FEBRUARY 9, 2011—DECIDED APRIL 19, 2011

Before EASTERBROOK, *Chief Judge,* and FLAUM and
RIPPLE, *Circuit Judges.*

FLAUM, *Circuit Judge.* Torrance Jones, a federal prisoner,
admits to pushing prison guard Richard Loftus during
an altercation at the Federal Correctional Institution in
Miami, Florida in 2006. Jones was found guilty of assault
at his ensuing disciplinary hearing and was sanctioned
with the loss of 14 days of good time credit. After ex-
hausting his administrative appeals, Jones petitioned for

a writ of habeas corpus in federal court pursuant to 28 U.S.C. § 2241, claiming that he was denied due process at the disciplinary hearing. The district court denied the petition. We affirm.

## I. Background

Jones is currently serving a 30-year sentence on federal drug trafficking charges. On August 31, 2006, Correctional Officer Richard Loftus escorted Jones to the Special Housing Unit ("SHU") at the Miami Federal Correctional Institution. To reach the SHU, Loftus and Jones needed to cross the open compound. Generally, inmates are not handcuffed in an open compound so as not to render them vulnerable to attack by other inmates. Nevertheless, Loftus ordered Jones to cuff up while the two were in the open compound. Jones refused, telling Loftus he would do so if the compound was closed. Loftus physically attempted to handcuff Jones twice, and twice Jones pulled away. Loftus then pushed Jones up against the SHU grill. According to Jones, Loftus pressed his forearm on Jones's throat, pinning him against the SHU grill. Jones pushed Loftus away. Eventually, Loftus cuffed Jones. Counselor Jose Cabrera witnessed the incident, which also was captured on surveillance video. Following the incident, Jones complained of tenderness at his lower throat and neck area and received medical treatment.

Later on the 31st, Loftus filed an incident report, citing Jones for assaulting another person in violation of code 224, and refusing to obey an order in violation of code 307. *See* 28 C.F.R. § 541.3. The Bureau of Prisons

("BOP") suspended its internal disciplinary process while the FBI investigated the incident and the United States Attorney's Office determined whether to criminally prosecute Jones. The U.S. Attorney decided not to charge Jones on September 13, 2006. Jones received a copy of the incident report that same day.

A Unit Disciplinary Committee ("UDC") hearing regarding the incident was initiated on September 20, 2006. The UDC's report indicates that Jones requested no witnesses at that time, but Jones maintains that he told Counselor Roche (who conducted the UDC hearing) that he had two witnesses. According to Jones, he knew only the witnesses' nicknames, and Roche promised to try and identify the men. Jones heard nothing further from Roche.

The UDC referred the case to Detention Hearing Officer ("DHO") Yida Posada. Jones's DHO hearing was convened and extended on three occasions in October 2006. The DHO's notes from one of those occasions states "Tyrone Walker, witness no reply." She does not recall the meaning of that note.

The DHO hearing eventually was held on October 23, 2006. David Tosana served as Jones's staff representative. Jones had a brief meeting with Tosana—his first and only meeting with his representative—prior to the hearing. At that time, Jones asked that Tosana view the surveillance video of the incident. Jones also told Tosana that he wanted an inmate, Irvin Green, to testify at the DHO hearing. Jones contends that he told Tosana that Green could provide the name of a second witness.

That individual has since been identified as Yves St. Hilaire. However, Tosana does not remember Jones mentioning another witness, and St. Hilaire did not testify at the DHO hearing. The DHO's report indicates that Green was the only witness Jones requested. The DHO's notes from October 23 state: "Witness (Irvin Green) the other name is incorrect"; she has no recollection of what that note meant. Jones maintains that he would have requested a third witness as well, an inmate named Jorge Masvidal, had Masvidal not been released prior to the DHO hearing, on September 20, 2006. Jones never mentioned Masvidal to Tosana or the DHO.

After Jones and Tosana met, there was a several-hour recess during which Tosana viewed the surveillance video and prepared a memorandum for the DHO describing its contents. Jones was not permitted to watch the video. Tosana's memorandum stated in relevant part:

> Counselor Jose Cabrera was standing in front of the grill area when I observed Officer Richard Loftus S.O.S. escorting inmate Torrence [sic] Jones (19267-018) to Special Housing Unit. Inmate Jones and Officer Loftus appeared to be struggling as they approached the Grill area. It appeared as though Officer Loftus was attempting to apply restraints on inmate Jones and inmate Jones appeared to be resisting by walking away from Officer Loftus and not placing his hands behind him. . . . Officer Loftus attempted to pin inmate Jones' chest to the SHU grill and cuffing [sic] him, but inmate Jones again resisted by pulling away

and turning around. Officer Loftus then pushed inmate Jones in the chest and pinned him against the grill area by placing his left forearm on inmate Jones' neck (throat area). At that time inmate Jones placed both hands on Officer Loftus' chest and pushed Officer Loftus away from him.

Tosana also interviewed Green. Jones agreed to have Green's testimony presented through a statement rather than have Green testify in person. Therefore, Tosana prepared a memorandum for the DHO describing Green's statements. Green did not testify about the August 31 incident. Rather, he stated that Loftus generally was aggressive towards and disrespectful of inmates.

In addition to Tosana's two memoranda, the DHO had before her a statement from Cabrera, the eyewitness. Cabrera stated, in relevant part, that he observed Jones refuse Loftus's order to cuff up "because the compound was not closed and that was the rules." He further stated that Jones pulled away from Loftus twice when Loftus tried to cuff him, and that Loftus then "placed the inmate against the Special Housing grill. The inmate spun around and placed both hands on officer Loftus. The inmate push[ed] officer Loftus back hard."

Also before the DHO was a description of the surveillance video prepared by Bob Wenzler, a Special Investigative Lieutenant. That memo reads, in relevant part:

> Richard Loftus, Senior Officer Specialist, attempted to place hand restraints on inmate [Jones]. The video further revealed, inmate Jones resisted officer Loftus' attempt to place restraints on him by spinning away

from Loftus on two occasions. The third time officer Loftus put inmate Jones against the Special Housing Unit grill door. Inmate Jones then assaulted officer Loftus by pushing him away which cause[d] officer Loftus to almost lose his balance. Officer Loftus then regained his balance[,] then restrained inmate Jones and escorted him into the Special Housing Unit.

At the hearing, Jones gave his account of the incident, stating that Loftus "kept on trying to cuff me up," and that Loftus "put his forearm against my windpipe with force and I pushed him away." Jones further stated that he pushed Loftus in order to stop Loftus's assault.

The DHO found Jones guilty of both violations. Her report states that in reaching that conclusion she considered Cabrera's statement, Wenzler's memorandum, and Tosana's memorandum concerning the video. At an evidentiary hearing held before Magistrate Judge Philip M. Frazier on December 21, 2009, the DHO testified that she also reviewed the inmate injury assessment report, which described Jones's injuries from the incident, and that her failure to list it among the documentary evidence she considered was an oversight. In her written opinion, the DHO also considered Jones's position that he was protecting himself against Loftus's assault, as well as his admission that he pushed Loftus. She concluded that "the fact still remains that after resisting to be restrained, [Jones] pushed a staff member with force. This constitutes an act of aggression." The DHO sanctioned Jones with (among other things) the loss of 14 days of good conduct time. Jones exhausted internal appeals of that disciplinary decision.

On September 24, 2007, Jones filed a habeas petition challenging the constitutionality of his prison disciplinary proceeding. Jones filed a motion for summary judgment on October 28, 2009. At the December 21, 2009 evidentiary hearing before the magistrate judge, the DHO testified that she did not see photographs of Jones's injuries at the hearing. Jones testified that he was unable to present photographs of his injuries to the DHO because he never received them prior to the hearing. He further stated that he was not given the opportunity to review any of the documentary evidence, including medical reports, prior to his hearing. Jones also stated that he requested that the DHO review the medical reports and consider the treatment he received after the incident.

On February 23, 2010, Magistrate Judge Frazier issued a Report and Recommendation concluding that Jones had not been denied due process, and recommending both the denial of Jones's motion for summary judgment and the entry of judgment against him. Jones filed objections to the Report and Recommendation. Chief District Judge Herndon reviewed and ultimately overruled those objections, issuing an opinion adopting the magistrate's Report and Recommendation on September 28, 2010. Jones timely appealed.

## II. Discussion

We review de novo the district court's denial of Jones's § 2241 petition. *Daniels v. Knight*, 476 F.3d 426, 433 (7th Cir. 2007).

Federal inmates must be afforded due process before any of their good time credits—in which they have a liberty interest—can be revoked. *See Brooks-Bey v. Smith,* 819 F.2d 178, 180 (7th Cir. 1987). In the context of a prison disciplinary hearing, due process requires that the prisoner receive (1) written notice of the claimed violation at least 24 hours before hearing; (2) an opportunity to call witnesses and present documentary evidence (when consistent with institutional safety) to an impartial decision-maker; and (3) a written statement by the fact-finder of the evidence relied on and the reasons for the disciplinary action. *See Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007); *Wolff v. McDonnell,* 418 U.S. 539 (1974). A disciplinary decision must also be supported by "some evidence" to satisfy due process. *Scruggs*, 485 F.3d at 941 (quoting *Superintendent, Mass. Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985)).

Jones raises numerous due process challenges to his disciplinary hearing. Jones first contends that his due process rights were violated because both his receipt of the incident report and his disciplinary hearing occurred outside the time frames set forth in the applicable BOP regulations. Jones also argues that he was wrongfully denied the opportunity to view the surveillance video, review and present documentary evidence, and call certain witnesses. Jones further objects to the DHO's failure to watch the surveillance video. According to Jones, these multiple violations denied him the opportunity to present his "actual innocence" defense—namely, that he lacked the specific intent to injure Loftus, and therefore cannot be found guilty of assault. As discussed

below, that argument contains a fundamental flaw that dooms Jones's appeal. Finally, Jones contends that he was found guilty based on insufficient evidence.

We begin with Jones's argument that delays in the disciplinary process, which allegedly violated BOP regulations, constituted a deprivation of due process. BOP regulations provide that "[s]taff shall give each inmate charged with violating a Bureau rule a written copy of the charge(s) against the inmate, ordinarily within 24 hours of the time staff became aware of the inmate's involvement in the incident." 28 C.F.R. § 541.15(a). Here, Jones did not receive a copy of the incident report until 13 days after the incident. BOP regulations also provide that an inmate's "initial hearing before the UDC, ordinarily [will be] held within three work days from the time staff became aware of the inmate's involvement in the incident." *Id.* § 541.15(b). That time frame may be extended "for a good cause shown by the inmate or staff and documented in the record of the hearing." *Id.* § 541.15(k). Furthermore, the regulations allow prison staff to "suspend disciplinary proceedings for a period not to exceed two calendar weeks while informal resolution is undertaken and accomplished." 28 C.F.R. § 541.11, table 2, n. Here, the UDC hearing was held almost three weeks after the incident, and the DHO hearing occurred nearly two months after the incident. Jones argues that the prison violated § 541.15(a) and (b), and that those violations deprived him of due process.

Jones's delay argument is not based on his liberty interest in his good time credits. As noted above, with

respect to timing, all that due process requires is that prisoners be given written notice of alleged violations at least 24 hours before a disciplinary hearing. Jones had more than sufficient notice—he received the incident report a week before his UDC hearing and over a month before his DHO hearing. Rather, Jones argues that he has a separate liberty interest in the time frames set forth in § 541.15(a) and (b).

Before considering whether those regulations give rise to a liberty interest, we note that whether Jones has established a violation of the regulations is not clear. Jones acknowledges that the reason for the initial delay was the pending FBI investigation, which likely provides "good cause" for at least a portion of the delay in holding the UDC hearing. Moreover, the regulations—which address the timing of only notice to an inmate and the UDC hearing, not the DHO hearing—appear to be advisory, stating when events "ordinarily" should occur. But even assuming there was a violation of BOP regulations in this case, that violation did not infringe Jones's constitutionally-protected rights.

Noncompliance with § 541.15(a) and (b) amounts to a due process violation only if those regulations create a liberty interest. Prison regulations give rise to a liberty interest only if they shield inmates from an "atypical or significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see also Crowder v. True*, 74 F.3d 812, 814 (7th Cir. 1996) (applying *Sandin*, which addressed state-created liberty interests under the Fourteenth Amendment, in

the context of a Fifth Amendment claim involving federal prison regulations). The delays at issue did not impose an "atypical or significant hardship" on Jones warranting due process protection.

Moreover, Jones suffered no prejudice as a result of the delays, so any conceivable due process violation was harmless. *See Piggie v. Cotton*, 344 F.3d 674, 678 (7th Cir. 2003) (using harmless error analysis in review of prison disciplinary board's alleged denial of prisoner's right to call witness at disciplinary hearing). Jones argues that the delays prejudiced him by preventing him from calling Masvidal as a witness, as Masvidal was released from prison on September 20, 2006, the day of Jones's UDC hearing. Jones claims that Masvidal would have testified that Loftus pinned Jones against the SHU grill by placing his forearm on Jones's throat, and that Jones had not assaulted Loftus. In short, Masvidal would have corroborated Jones's version of events.

But the DHO had other evidence corroberating that version of events before her. Specifically, she considered Jones's statement that he pushed Loftus only to stop him from cutting off Jones's windpipe, as well as Tosana's memorandum, which confirmed that Loftus pinned Jones against the grill area by placing his forearm on Jones's neck. Masvidal's testimony merely would have been cumulative of that evidence. Moreover, the DHO *credited* Jones's version of events—that he only pushed Loftus to free his windpipe. Nevertheless, she concluded that, regardless of Jones's motive, he was guilty of assault because he admittedly pushed a staff

member with force. In essence, the DHO found that Jones's admission that he pushed Loftus provided sufficient evidence to support a finding of guilt on the assault charge. Plainly, Masvidal's testimony that Loftus was the aggressor would not have changed the DHO's decision. Because Jones's inability to present Masvidal's testimony did not prejudice him, any conceivable error was harmless.

The same harmless error analysis applies to Jones's inability to call St. Hilaire as a witness. Jones contends that, like Masvidal, St. Hilaire would have testified as to his "actual innocence." In other words, St. Hilaire would have verified Jones's version of events in which he only pushed Loftus to free himself. As explained above, that testimony would have done nothing to help Jones's defense, and therefore any error related to St. Hilaire also was harmless.

We turn now to Jones's contention that he was denied due process because he was not permitted to view evidence that he characterizes as exculpatory, including the surveillance video, his medical reports, photographs of his injuries, Counselor Cabrera's report, Bob Wenzler's report, and Staff Representative Tosana's memoranda. The rule of *Brady v. Maryland*, 373 U.S. 83 (1963), requiring that material exculpatory evidence be disclosed to a criminal defendant, applies in the context of prison disciplinary proceedings. *Piggie*, 344 F.3d at 679. Consequently, procedural due process required prison officials to disclose all material exculpatory evidence to Jones. *Scruggs*, 485 F.3d at 939. There is an exception, however,

to the disclosure of material, exculpatory evidence that "would unduly threaten institutional concerns." *Id.* (citations omitted).

In this context, the purpose of the *Brady* rule is "to insure that the disciplinary board considers all of the evidence relevant to guilt or innocence and to enable the prisoner to present his or her best defense." *Piggie*, 344 F.3d at 678. Jones argues that his lack of access to the evidence prevented him from presenting what he calls his actual innocence defense. As noted above, according to Jones, he is not guilty of assault because he lacked the specific intent required for assault—the intent to cause physical injury. But lack of specific intent is not a valid defense to assault in the context of a prison disciplinary action. Nor is self-defense, which may better describe Jones's defense.

Intent to do harm is an element of both criminal assault and common law tortious assault. *See* 6A C.J.S. *Assault* § 81 (2011) ("intent to injure or to cause a reasonable apprehension of bodily injury is an essential element of [criminal] assault"); RESTATEMENT (SECOND) OF TORTS § 21 (1965) (liability for tortious assault requires intent "to cause a harmful or offensive contact . . ., or an imminent apprehension of such a contact"). However, Jones was neither convicted of criminal assault, nor held civilly liable for assaulting Loftus. Rather, he was found to have violated section 224 of 28 C.F.R. § 541.3, the BOP's prohibition on inmates "assaulting any person." Jones presents no argument that section 224 should be interpreted to incorporate the common law definition of assault.

And an analysis of that section suggests that the BOP did not intend such a reading of the regulation.

At common law, assault involved no physical contact (only the threat of such contact), whereas battery did require such contact. *See United States v. Vallery*, 437 F.3d 626, 631 (7th Cir. 2006). The BOP's regulation defining prohibited acts by inmates does not include a separate prohibition on battery. Code section 224, which prohibits assault, states that "a charge at this level is used when less serious physical injury or contact has been attempted or accomplished by an inmate." The term "assault," as it is used in section 224, appears to incorporate the concepts of both common law battery and assault. Because the section 224 is not coextensive with common law assault, we see no reason to import an intent requirement. Moreover, battery (which section 224 incorporates) does not require intent to injure, only intent to make the offensive contact. *See* RESTATEMENT (SECOND) OF TORTS § 13 cmt. c (1965) (liability for tortious battery requires intent "to cause a harmful or offensive contact," and "it is immaterial that the actor is not inspired by any personal hostility to the other, or a desire to injure him"). Jones admittedly intended to push Loftus. Therefore, even if we were inclined to import common law principles to our interpretation of the BOP regulations, Jones possessed the requisite intent.

Jones's defense can also be viewed as one of self-defense. But we have held that inmates do not have a constitutional right to raise self-defense as a defense in the context of prison disciplinary proceedings. *See Scruggs*,

485 F.3d at 938-39; *Rowe v. DeBruyn*, 17 F.3d 1047, 1049 (7th Cir. 1994). As such, the DHO was under no constitutional obligation to allow Jones's claim that he was merely defending himself to serve as a complete defense to the charge of assault. She was permitted, as she did, to find Jones guilty based on his admission alone, regardless of motivation.

Because Jones's claimed defense is not a valid one, none of the evidence he says he should have been provided can be characterized as exculpatory. Only evidence that undermined or contradicted Jones's admission that he pushed Loftus would be exculpatory, and none of the evidence at issue does so. Jones was entitled only to exculpatory evidence, and therefore there was no due process violation. Moreover, because the evidence was not exculpatory, it would not have changed the outcome of the DHO hearing, and thus Jones suffered no prejudice.

Jones's claim with respect to the video fails for the additional reason that prison officials are not required to disclose evidence that would unduly threaten institutional safety. We have held that an inmate is not entitled to disclosure of an exculpatory surveillance video if allowing the inmate to see the tape would entail a security risk. *Piggie*, 344 F.3d at 679. In addition, we have recognized that one "bona fide security justification" for non-disclosure is that the video might allow the inmate to "learn the location and capabilities of the prison surveillance system, thus allowing him to avoid detection in the future." *Id.*; *see also Johnson v. Finnan*, 467

F.3d 693, 694 (7th Cir. 2006) (stating in dicta that "security concerns may make it prudent to prevent inmates from learning the capabilities of the video monitors"). Here, respondent asserts that allowing Jones to view the video would have provided him with the location of the surveillance camera that captured the incident, its field of view, and the image resolution, all of which would give rise to safety risks. Respondent's valid concern justifies the DHO's refusal to allow Jones to see the video himself.

The fruitlessness of Jones's actual innocence defense also dooms his objection to the DHO's refusal to view the surveillance video. There is no dispute that the video shows Jones pushing Loftus. Even if it also shows Loftus using force on Jones first, that does not change the fact that "physical injury or contact [was] attempted or accomplished by" Jones in violation of section 224.

Finally, Jones asserts a sufficiency of the evidence argument. The DHO's decision need only be support by "some evidence in the record." *Webb v. Anderson*, 224 F.3d 649, 652 (7th Cir. 2000) (citation omitted). We have characterized the "some evidence" standard as a "meager threshold." *Scruggs*, 485 F.3d at 941. Once that threshold is crossed, we will not reverse. *Id.* Here, Jones's own admission provides sufficient evidence to uphold the DHO's decision. Because the DHO "was not required to accept that protecting [himself] was a defense that could shield [Jones] from the [assault] charge," the evidence was sufficient to sustain the finding of guilt. *Id.*

### III. Conclusion

For the foregoing reasons, we AFFIRM THE denial of the petition.